EXHIBIT 2 – Memorandum of Agreement

Memorandum of Agreement
Between
Clark County, Nevada and the
Bureau of Land Management
U.S. Department of the Interior

This Memorandum of Agreement ("Agreement") is made and entered into by the County of

Clark, a political subdivision of the State of Nevada ("the County"), acting pursuant to N.R.S. §

277.180, and the United States, by and through the Department of the Interior, Bureau of Land

Management ("BLM"), acting pursuant to the Federal Land Policy and Management Act of 1976

("FLPMA"), 43 U.S.C. § 1701 *et seq*, the Southern Nevada Public Land Management Act of 1998

("SNPLMA"), 105 P.L. 263, 112 Stat. 2343, and all other applicable federal and state laws, rules and

regulations.

WHEREAS, the BLM and the County entered into a Cooperative Management Agreement

on November 4, 1992, ("the 1992 Agreement") delineating respective responsibilities in

cooperatively managing approximately 5,000 acres of certain federal public lands in and around

McCarran International Airport ("the Airport"). The 1992 Agreement had the objective, among

others, of protecting the Airport from federal land disposal that could result in land uses

incompatible with the Airport.

WHEREAS, the area covered by the 1992 Agreement is known as the Cooperative

Management Area ("the CMA"), and contained approximately 5,000 acres of public land, within set

boundaries and is identified in Exhibit 1 to the 1992 Agreement.

WHEREAS, the publicly-held CMA land is interspersed with parcels of privately owned

lands.

WHEREAS, in 1998, Congress passed SNPLMA which allowed the Secretary of the Interior,

through the BLM, to transfer to the County, without consideration, all right, title, and interest of the

MOA for McCarran Airport CMA—Final September 16, 2004

Exhibit 2 -- Page 1 of 12

United States in the publicly held CMA lands as identified in the 1992 Agreement. The United States has transferred, or is in the process of transferring, all of its right, title and interest in all the public lands within the CMA to the County.

WHEREAS, SNPLMA provides that the County will manage the CMA in accordance with the 1992 Agreement and with the County's Noise Compatibility Planning provisions for McCarran International Airport, established pursuant to Section 47504 of Title 49, United States Code and its related regulations.

WHEREAS, SNPLMA requires that, if the County sells, leases, or otherwise conveys CMA land, such sale, lease or conveyance shall be for fair market value ("FMV") and that 85% of the gross proceeds shall be contributed by the County to the special account established under section 4(e)(1)(C) of the SNPLMA ("SNPLMA special account") for use by the federal government for acquisition of environmentally sensitive land in the State of Nevada and other purposes authorized under SNPLMA.

WHEREAS, SNPLMA requires that, if the County sells, leases, or otherwise conveys CMA lands within areas governed by the provisions of the federal Santini-Burton Act, proceeds contributed to the SNPLMA special account shall be used by the federal government to acquire environmentally sensitive land in the Lake Tahoe Basin.

WHEREAS, the Parties wish to memorialize their understanding and agreement as to the methods and procedures to be used to account for the County's transactions involving sales, leases or other conveyances of CMA land and to provide for payment to the SNPLMA special account.

NOW, THEREFORE, it is agreed as follows:

I.   **Definitions:**

A.   "Agreement" means this Memorandum of Agreement, together with all attachments, duly and fully executed modifications, amendments or supplements.

B.   "BLM" means the United States Department of the Interior, Bureau of Land Management.

C.   "County" means the County of Clark, a political subdivision of the State of Nevada.

D.   "Fiscal Year" means Clark County's accounting period, which begins July 1st and ends June 30th.

E.   "Fiscal year quarter" means Clark County's fiscal year divided into four reporting periods. The first quarter is July 1st through September 30th, the second quarter is October 1st through December 31st, the third quarter is January 1st through March 31st and the fourth quarter is April 1st through June 30th.

F.   "Parties" means the BLM and the County.

G.   "Santini-Burton boundary" means the boundary adopted by Congress depicting lands that fall within the area governed by the Santini-Burton Act, 96 P.L. 586, 94 Stat. 3381, which are shown on map numbered 7306A, dated May 1980, and entitled "Las Vegas Valley, Nevada, Land Sales Map."

II.   **The County and the BLM agree as follows:**

A.   The term "conveyance" as used in Section 4(g)(4) of SNPLMA shall be construed to mean the transfer of legal title to an estate or interest in real property by means of an appropriate instrument. In addition to sales, exchanges and leases, the other interests in property which have been and will be granted, and that shall be considered a conveyance for the purposes of this MOA include:

(1)     licenses for utilities or other parties to have access across a portion of CMA land which is not in a dedicated road or right-of-way;

(2)     temporary use permits;

(3)     grants of easement; and

(4)     other similar licenses, permits, grants of use and contracts from which the County generates proceeds from the lease or occupancy of County-owned CMA land.

The term "conveyance" does not apply to any utility (e.g., electricity, telephone, cable television, pipeline, etc.) placed in a dedicated road or right-of-way under a franchise agreement or where the County is prohibited by state or federal law from collecting money for such utility use.

B.      (1)     The term "fair market value" as used in Section 4(g)(4) of SNPLMA shall be based upon the highest and best use of the property, as determined by one or more disinterested, competent real estate appraisers, licensed by the State of Nevada, using widely accepted appraisal standards. Except as provided in subsection (3), below, under no circumstance shall a sale, lease, or other conveyance for CMA lands be accepted by the County for less than the appraised fair market value.

(2)     For the purpose of determining the fair market value of leases which provide for the County to receive rental payment based upon a percent of the net proceeds earned by the lessee ("participatory rent"), the net present value of the total projected proceeds to be paid to the County over the term of the lease as participatory rent shall at least equal the net present value of the total

projected income stream over the term of a ground lease of the property as if
the lease were to charge periodic rental rates at fair market value.

(3) Except for sales or exchanges of land which always require a separate
appraisal for each such transaction, it is agreed that small or short-term leases
or other conveyances with total gross proceeds of less than $30,000 over the
life or term of the lease or other conveyance, unless otherwise required by
Nevada law, shall utilize a market rental survey, prepared at least annually by
a qualified appraiser, in support of the fair market value for such leases or
other conveyances.

C. The term "gross proceeds" as used in Section 4(g)(4) of SNPLMA shall include any
money or cash value acquired by the County for its CMA land as a result of a sale,
lease, or other conveyance including that amount which may be above the appraised
fair market value. Gross proceeds also includes cash equalization payments made to
the County in an exchange.

D. EXCHANGES.

(1) Within the CMA.

(a) The County may exchange CMA land it has acquired under SNPLMA for
other privately-held lands within the CMA area. The County may acquire
property of equal appraised value, property of lesser appraised value
provided the County receives a cash equalization payment, and property of
greater appraised value. The policy expressed in SNPLMA which restricts
land uses in the CMA area to those consistent with airport noise
compatibility is furthered by exchanging County-owned CMA land for

other land in the CMA area. Such exchanges help alleviate problems caused by interspersed County owned CMA land and land held by others within the CMA boundaries by assembling parcels in common ownership. The County may then impose appropriate land use restrictions over larger parcels of land. In addition, assembling parcels in common ownership is also expected to maximize fair market value of any larger parcels which are later sold, leased or otherwise conveyed.

(b) Except for any cash differential paid to the County to equalize the value of the exchanged properties (i.e., cash equalization payment), there are no "gross proceeds", as used in Section 4(g)(4) of SNPLMA, realized at the time of an exchange. The land which the County acquires as part of an exchange shall be subject to the provisions of SNPLMA, including the requirement that 85% of any gross proceeds received by the County for the sale, lease, or other conveyance of such land shall be contributed to the SNPLMA special account, as if the land acquired by the County within the CMA were originally acquired by the County from the United States under SNPLMA.

(c) In the event the County exchanges property within the CMA where the County acquires property of higher appraised value than it conveys, and the County makes a cash equalization payment to the other party in the exchange, the newly-acquired County parcel shall be subject to the provisions of SNPLMA, including the requirement that 85% of any gross proceeds received by the County for the sale, lease or other conveyance of

such land shall be contributed to the SNPLMA special account, as if the land acquired by the County within the CMA were originally acquired by the County from the United States under SNPLMA, EXCEPT that the "gross proceeds" of any conveyance of the newly-acquired County parcel shall be adjusted to reduce the "gross proceeds" by a percent equal to the percent of the cash equalization payment to the total value of the parcel at the time of the exchange. This adjustment to the gross proceeds will be applied as follows: (i) if the entire newly-acquired County parcel is conveyed by the County as a single parcel, a deduction shall be made from gross proceeds equivalent to the percentage of the equalization payment to the total value of the newly-acquired parcel at the time of the original exchange; (ii) if the newly-acquired County parcel is subdivided, and only a portion of the newly-acquired parcel is conveyed by the County, a proportionate deduction shall be made from gross proceeds equal to the percent of the parcel conveyed multiplied by the percentage of the equalization payment to the total value of the newly acquired parcel at the time of the original exchange. For example, if at the time of the exchange, 10% of the value of the parcel is attributed to cash and 90% is attributed to the CMA land being exchanged by the County, upon conveyance of the entire newly-acquired parcel, the gross proceeds shall be reduced by 10%; or if the County subdivides the newly-acquired parcel and conveys only a 30% portion thereof, the deduction from gross proceeds shall be 10% of

30% or a .03% deduction from the gross proceeds from conveyance of that 30 percent portion of the newly-acquired parcel.

(2)    Outside of the CMA. The County may exchange CMA land it has acquired under SNPLMA for other lands outside the CMA area. However, such an exchange shall be treated for the purposes of this Agreement as if it were a sale for which cash proceeds were received, and the County will contribute to the SNPLMA special account 85% of the fair market value of the CMA land involved. Any land acquired outside the CMA area under this type of exchange is not thereafter subject to this Agreement or to the land use restrictions imposed on CMA land under SNPLMA.

III.    **The County agrees as follows:**

A.    REMITTANCE TO BLM. County agrees to remit to BLM by the 15th day following each fiscal quarter end, 85% of the cash proceeds from all sales, leases and other conveyances of the County's CMA land, and a record of any and all interests in real estate acquired by the County within the CMA boundaries in exchange for the County's CMA land, received by the County during that previous fiscal quarter.

B.    REMITTANCE REPORTS TO BLM.

(1)    The County agrees to submit to BLM by the 15th day following each fiscal quarter end, a report detailing and explaining the remittances to BLM under paragraph A above. The report shall itemize all said transactions within and pertaining to the County's CMA lands, including the deposit date, entity involved, leases, land sales, (parcel number, transaction number, contract number, legal description, and any other relevant identification), or other

conveyances for which revenue is generated, total revenues and the number of acres sold. The report shall also distinguish between transactions which occur wholly within the Santini-Burton boundary, and those which occur wholly outside of the Santini-Burton boundary, and those which may occur involving lands both within and outside the Santini-Burton boundary.

(2)     In the case of exchanges within the CMA, the County agrees to provide to BLM sufficient information (parcel number, transaction number, contract number, legal description, and any other relevant identification) in the remittance report that BLM can determine the interest in real property that was acquired by the County and the interest in real estate that was exchanged by the County.  Lands acquired by the County shall be identified as to whether any future proceeds shall be attributable to the purposes of the Santini-Burton Act.

C.     CONVEYANCES

(1)     The County agrees to make available to BLM sufficient information on all other conveyances, as the term is construed in Section II. A., above, to identify the affected parcel, the type of conveyance and the value of the conveyance.

(2)     Legal Notices.  The County agrees to mail a copy of all legal notices to BLM regarding sales, leases, or conveyances of its CMA lands.

D.     MAPS.

(1)     Quarterly Maps.  The County agrees to provide to BLM, by the 15th day following each fiscal quarter end, together with the quarterly remittance

MOA for McCarran Airport CMA—Final  September 16, 2004

Exhibit 2 -- Page 9 of 12

report, a map illustrating, to the extent practical, all land sales, exchanges, leases, or other conveyances for which revenue is generated which occurred during that previous quarter. If it is impractical for the County to supply said maps to BLM quarterly, other arrangements may be made between the County and BLM, provided that such a map is provided to BLM no less than annually.

(2)   Annual Status Maps. In addition to the quarterly maps, the County agrees to provide to BLM a map, on an annual basis, showing the ownership interests of all lands within the CMA. In the case of exchanges where the County has received a full or partial interest in real property, the County agrees to identify the interest obtained in order that BLM can determine which new lands are to be subject to SNPLMA's requirement that 85% of the gross proceeds be contributed to the SNPLMA special account. Such map shall show the ownership interests as of June 30 each year and be submitted to the BLM by July 15th. If the 4th quarterly map provides all of the information required for an annual status map, it shall be accepted as the annual status map.

E.   AUDITS. The County agrees to make available for review and audit by BLM, or BLM's representative, records of all sales, leases or other conveyances involving the County's CMA lands. The County agrees that all sales, leases or other conveyances involving the County's CMA lands shall be subject to audit by BLM at such times and dates that may be further agreed upon by BLM and the County, provided that the County agrees that BLM shall have the right to audit the County's CMA sales, leases or other conveyances on no less than an annual basis. The County further agrees that BLM shall have the right to audit all such transactions occurring since the effective

date of the SNPLMA. Audits shall be conducted during regular County business hours and shall minimize any interruption of the day-to-day operation of the Clark County Department of Aviation.

IV.    **BLM agrees as follows:**

    A.    BLM agrees that it will assist the County, as needed, with any issues that may arise from the transfer of the CMA lands from federal to County ownership.

    B.    BLM agrees that it will, in advance, coordinate and cooperate with the County in determining dates and logistics of audits.

    C.    BLM agrees that it will make available to the County the audit report and findings and to work with the County to resolve any disputes.

V.    **MEDIATION OF FUTURE DISPUTES.** The Parties agree that should any conflicts or disagreements arise between the Parties concerning the terms of this Agreement that they will make good faith efforts to resolve such disputes prior to commencing litigation. The Parties agree to arbitration or mediation only with the written consent of all parties to the conflict or disagreement.

VI.    **COMPLETE AGREEMENT.** This Agreement, including its Attachments, represents the complete understanding of the Parties with respect to the terms of this Agreement and supersedes all inconsistent prior understandings, agreements and disagreements with respect to such terms.

VII.    **MODIFICATION AND AMENDMENT.** This Agreement may be modified, amended, or supplemented, in writing by mutual agreement of the Parties. Modification, amendment or supplement to this Agreement shall be made only in writing and fully executed prior to any changes being performed.

VIII. <u>TERMINATION</u>. This Agreement shall continue in force unless formally terminated by the written consent of all Parties.

**IN WITNESS WHEREOF THE PARTIES AFFIX THEIR SIGNATURES BELOW:**

Bureau of Land Management

BY: Bob Abbey, Nevada State Director

Date: 10·17·04

County of Clark, Nevada

BY: Chip Maxfield, Chairman
　　　Clark County Board of Commissioners

Date: October 5, 2004

**APPROVED AS TO FORM:**
**DAVID ROGER, DISTRICT ATTORNEY**

BY:

E. LEE THOMSON
Chief Deputy District Attorney